**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JUSTIN SCOTT, | : | |
| | : | Civil Action No. 13-2578 (PGS) |
| Plaintiff, | : | |
| | : | |
| v. | : | OPINION |
| | : | |
| CHARLES ELLIS, et al., | : | |
| | : | |
| Defendants. | : | |

**SHERIDAN, District Judge:**

Presently before the Court is a motion for summary judgment on *Pro Se* Plaintiff Justin Scott's civil rights claims, brought by Defendants Charles Ellis, Linda Rogers, Christopher Estwan, Sergeant Creighton, Sergeant Miszak, Sergeant Walker, and Christopher Frascella (collectively, "Defendants"). The Court held oral argument on the motion on January 23, 2015, and now issues its ruling. For the following reasons, summary judgment is granted on all of Plaintiff's claims, with the exception of Plaintiff's cruel and unusual punishment claim against Defendant Ellis. Summary judgment is denied, without prejudice, on that claim. Discovery is reopened to permit Plaintiff to supplement the summary judgment record on that claim.

**I.      BACKGROUND**

Plaintiff filed the instant suit seeking redress from several employees at Mercer County Correction Center ("MCCC"), where Plaintiff claims he was subjected to cruel and unusual punishment, denied access to the courts, denied medical care, and retaliated against for exercising his first amendment rights. For example, in his complaint, Plaintiff alleged that Defendant Charles Ellis, the warden of MCCC, ordered him to be kept in a cell with no blanket, sheets, socks, towels,

1

jumper or other articles of clothing to keep him sufficiently warm while housed at the prison, among other cruel acts.  (Compl., ¶6.)  Plaintiff also alleged that Defendant Walker, a corrections officer, utilized excessive force in restraining him, and that several of the Defendants retaliated against him for filing grievances against staff, and for practicing his religion.  (*Id.*)

## A.    Procedural History

Pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, this Court *sua sponte* screened Plaintiff's Complaint for dismissal in an Opinion dated September 13, 2013.  That Opinion thoroughly addressed each of Plaintiff's claims, concluding that several claims were subject to dismissal or narrowing.[1]  The Court will not repeat that analysis here, but will focus on the claims that survived screening.  The surviving claims include Plaintiff's eighth amendment denial of medical care, cruel and unusual punishment, and excessive force claims.  In addition, Plaintiff's retaliation claims—to the extent they relate to his filing of grievances—survived screening.

Notably, as confirmed at oral argument, the parties did not engage in any discovery in this case; therefore, the summary judgment record does not include any depositions and is limited to affidavits from the Defendants and portions of Plaintiff's institutional record.[2]  In addition, Plaintiff submitted copies of numerous grievances that he filed during his placement at MCCC.

---

[1]    In addition, two defendants named in the complaint were dismissed— Patricia Hundley and Mary Knight.

[2]    The Court notes that the parties have not submitted Statements of Material Facts, in accordance with Local Civil Rule 56.1.  Although the Court could dismiss Defendants' motion for summary judgment for failure to comply with Rule 56.1, as Defendants did not submit the separate statement of facts that the rule requires, the Court elects not to do so in this case because Defendants' brief includes a detailed fact section that points to the summary judgment record, and because Plaintiff likewise points to the record in his opposition.  *See Park v. Secretary U.S. Dept. of Veterans Affairs*, --- F. App'x ---, 2014 WL 6804371, at *4 (3d Cir. Dec. 4, 2014) (affirming district court's decision to consider statement of material facts incorporated into brief, despite technical violation of Local Rule 56.1).

Other than the grievances, Plaintiff has not submitted record evidence such as an affidavit, certification, or statement that has been subscribed in proper form as true under penalty of perjury. While Plaintiff submitted a document he titled "certification" as a "supplemental opposition" to Defendants' motion, there is no statement in the certification indicating that it was made under penalty of perjury.[3] (Pl. Supp. Op. at 1-3.) Accordingly, the following restatement of facts is drawn exclusively from Defendants' affidavits, Plaintiff's institutional record at MCCC, and Plaintiff's grievance forms.[4]

**B.    Facts**

The following facts are presented in the light most favorable to Plaintiff, as the Court must view the facts in that light in adjudging Defendants' motion. In addition, on account of Plaintiff's *pro se* status, the Court "carefully reviewed" the entire summary judgment record before the Court. *Stringer v. The Pittsburgh Police*, 408 F. App'x 578, 580-81 (3d Cir. 2011).

Plaintiff was housed at MCCC from August 3, 2011 to January 22, 2013. (*See* Defs.' Summ. Jdmt. Brief ("Defs.' Br."), ECF No. 23, Exh. A.) The day of his arrival at MCCC, Plaintiff

---

[3]   Defendants have asked the Court to strike this supplemental opposition. (*See* Defs.' Ltr. dated Sept. 26, 2014.). The Court denies Defendants' request in the interest of justice and in light of Plaintiff's *pro se* status.

[4]   While Plaintiff has made factual assertions in his opposition papers, the Court may not consider those unverified factual statements as rebutting facts in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c) (stating that summary judgment facts may be established by "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"). Nor may the Court rely on the facts set forth in the complaint to oppose a summary judgment motion. *See Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves*.") (emphasis added); *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) ("To survive a motion for summary judgment, the non-moving party cannot solely rest upon her allegations in the pleadings ….").

received a copy of the prison's Inmate Handbook.[5]  (Defs.' Br., Exh. B.)   The Inmate Handbook

is a standardized handbook applicable to all New Jersey Department of Corrections facilities that

was adopted in 2008.  *See* N.J.A.C. 10A:8-1.1 to 8-3.6.  *See also Allah v. Ricci*, No. CIV.A. 08-

1753 JAP, 2012 WL 243570, at *4 (D.N.J. Jan. 25, 2012) *aff'd*, 532 F. App'x 48 (3d Cir. 2013).

In addition, MCCC has Standard Operating Procedures ("SOP") that are confidential in

nature and not made available for review by prisoners.  These discipline-related procedures mirror

the New Jersey Administrative Code requirements for inmate discipline found in N.J.A.C. 10A:4.

(*See* Bearden Cert., ¶8.)  With regard to the use of force, the SOP on use of force provides that

officers may use force only when necessary to control inmate behavior, and that the force used

must be as minimal as possible.  (*See id.* at ¶9.)  The prison utilizes the "Use of Force Continuum,"

which directs that the "inmate's actions determine the level of force to be used in a particular

situation."  (*Id.*)  "Defensive tactics (including hands-on control, restraining techniques, and

handcuffing) are permitted if an inmate does not respond to a Correction Officer's presence, verbal

commands, or gentle physical coercion."  (*Id.*)  The SOP relating to the use of a restraint chair

provides that it may be used when it is believed that an inmate "may attempt to cause harm to

themselves, others, or property."  (*Id.* at ¶10.)  Those inmates placed in a restraint chair are usually

held outside of their cell in the prison's medical detention area.  (*Id.*)

Because Plaintiff's claims primarily revolve around several disciplinary events during his

time at MCCC, the Court will organize the remainder of the fact section around those events.

---

[5]      Defendants did not include a copy of the Inmate Handbook in the record.  Instead, they
seek to incorporate portions of the handbook by way of the Certification of Captain Richard
Bearden.  (*See* Defs.' Br. at 4 (citing certification and quoting from New Jersey Administrative
Code)).  Rather than relying upon Captain Bearden's certification for the contents of the handbook,
the Court will refer to the New Jersey Administrative Code in the first instance, where relevant.

Plaintiff's medical history is also interwoven into the restatement of facts, as Plaintiff was routinely receiving mental health and physical treatment by prison doctors and staff.

### 1.      September 2011 Event

Approximately one month after his arrival at MCCC, on September 9, 2011, Plaintiff was written up for disciplinary charges.  According to the disciplinary report of that same date, Plaintiff refused to obey orders directing him to "disburse and lock-in" by Living Unit Correction Officers and the Area Sergeant.  (Defs.' Br., Exh. C at 1.)  Plaintiff subsequently pled not guilty to the charges, and indicated at the hearing that "[w]hen the officers told me to lock in, I did. . . . I went to my cell."  (*Id.* at Exh. D.)   Hearing Plaintiff's testimony, and reviewing the disciplinary report, the hearing officer found Plaintiff guilty and imposed a 15 day detention sanction to be imposed from September 21, 2011 through October 5, 2011.  (*See id* at Exhs. D-F.)

### 2.    August 2012 Cell Flooding Event

In August 2012, Plaintiff was seen by a mental health professional at MCCC.  (*See id.* at Exh. Q.)  At an appointment on August 24, 2012, Plaintiff's medications were discussed as well as a lack of suicidal or homicidal thoughts.  (*Id.*)  He was encouraged, at this appointment, to continue taking his medication, to do self-inventory, and to use coping skills.  (*Id.*)

A few days later, on August 29, 2012, Plaintiff was charged with destroying, altering, or damaging government property.  According to the disciplinary report, Plaintiff broke the sprinkler head in his cell, which caused his cell to flood and his mattress to fill with water.  (*Id.* at Exh. G.) The extent of the water damage required that the mattress be discarded, and Plaintiff's alleged tampering with the sprinker head damaged the sprinkler head beyond repair.  (*Id.*)  Plaintiff was also accused of flushing his t-shirt and sheet down the toilet, which contributed to the flooding in his cell.  (*Id.*)  Plaintiff did not enter a plea on the flood-related charges, but requested that Corrections Officer Peterson and Sergeant Estwan be witnesses at his disciplinary hearing.  (*Id.*)

On the same day of this incident, Plaintiff was seen during mental health rounds.  (*Id.* at Exh. Q.)  During those rounds, according to Plaintiff's institutional log, he did not voice any complaints.  (*Id.*)  The following day, Plaintiff requested to see a mental health professional.  (*Id.*) He was seen on August 31, 2012, but there are no substantive notes regarding the visit.  (*Id.*)

The next day, September 1, 2012, Plaintiff saw a nurse on a sick call.  (*Id.*)  At this appointment, Plaintiff complained of pain in his sternum when he slept on the mattress in his cell. (*Id.*)  He denied any shortness of breath and palpitations, and his skin was warm and dry.  He requested a double mattress at that appointment, but was advised that "custody gives the mattress and [that he] should talk to the unit officer."  (*Id.*)  Plaintiff was prescribed motrin.  (*Id.*)

Also on September 1, 2012, Plaintiff had a follow up mental health appointment. Plaintiff discussed the flooding-related charges at this appointment.  According to his institutional records:

> [Plaintiff] reported that he was charged with flooding his room and he did not do it.  [Plaintiff] feel like his rights have been violated because now he is in a dry cell.  [Plaintiff] said he do not have a wash cloth or towel and he feel like it is against his rights.  [Plaintiff] said he is doing all he can to keep it together.  [Plaintiff] said he is tired of others seeing him as the same person his room mate [sic] is.

(*Id.*)  The medical notes further indicate that Plaintiff was "dressed in a[n] oversized tee shirt and a pair of boxers."  (*Id.*)  Plaintiff was seen again on September 4, 2012, for "being sore from sleeping on a bare matt[ress] …."  (*Id.*)  His file was marked as stable, and he was given no new medications.  When he was seen the following day, September 5, 2012, Plaintiff voiced no complaints, but he complained again of pain in his sternum on September 6, 2012.  (*Id.*)

At this disciplinary hearing on the flooding-related charge, Plaintiff stated in his defense: "It was him not me I[']m a brown man I just want to move out of that cell and have been asking to move."  (*Id.* at Exh. H.)  Plaintiff was adjudged guilty as charged, and a finding was made that he caused $560.00 in damage.  (*Id.*)  Based on the "seriousness" of the charge, Plaintiff was sanctioned as follows.  He was ordered to serve 14 days "lock," from August 29, 2012 through September 11, 2012.  (*Id.*)  He was also ordered to pay restitution in the amount of $560.00.  (*Id.*)

Following the hearing officer's decision, Plaintiff filed a grievance with Sergeant Moon, the Hearing Supervisor, on September 10, 2012.  On the grievance form, Plaintiff stated that although he was found guilty of breaking the sprinkler head, he "did not break [it] and was overcharged Apx. $560.00," and that he was currently "being housed in a cell with no fire suppression system . . . against the New Jersey Fire Code."  Pl. Supp. Op., Exh. 2.  Plaintiff requested that the restitution amount be re-evaluated, and that the fire suppression system in his

cell be fixed or that he be moved to a cell with a functional system.  Sergeant Moon directed the prison's maintenance department to provide him with copies of the repair costs.  (*Id.*)

Throughout early to mid-September 2012, Plaintiff was routinely seen by medical staff on their rounds.  (*See* Defs.' Br. at Exh. Q.) (noting visits from September 6 through September 19, 2012).  On September 20, 2012, Plaintiff had a follow-up appointment for sternal pain; although he denied pain at the time of the visit.  (*Id.*)  His mental health was also discussed at this visit; he was directed to continue his medications, and to be "aware of his triggers …."  (*Id.*)

The next month, on October 9, 2012, Plaintiff filed a second grievance, this time requesting copies of the maintenance receipt for repair of the broken sprinkler head, and addressing the grievance to the warden, Defendant Charles Ellis.  Pl. Supp. Op., Exh. 2.  Another sergeant, whose name is not clear from the copy of the grievance form, explained that the sprinkler cost was confirmed with maintenance.  (*Id.*)  There is no indication that Plaintiff received a copy of the receipts, and Plaintiff filed a third grievance on October 19, 2012, making a follow up request. (*Id.*)

### 3.    September 2012 Pill and Nail Clippers Event

Less than one month from his prior charge, on September 24, 2012, Plaintiff was charged with disruptive behavior.  Specifically, a disciplinary report was filed, indicating that he repeatedly banged on his cell door with his cup and kicked the door.  (*Id.* at Exh. I.)  He pled guilty to this charge.  (*Id.*)  On this same date, according to the disciplinary report, a routine search of Plaintiff's cell uncovered a set of nail clippers for which Plaintiff did not have permission to retain in his cell, as well as 5 pills.  (*Id.*)  Plaintiff also pled guilty to the pill charge, noting that he had not yet taken medicine disbursed to him earlier, but he disputed the nail clippers charge.  (*Id.* at Exh. J.)  The hearing officer found Plaintiff guilty of the disruptive behavior and pill charges and, consistent

with his plea, adjudged him not guilty of the nail clippers charge.  (*Id.*)  Plaintiff appealed this determination, and obtained a reduction in the number of administrative segregation days imposed.  (*Id.* at Exh. K-L.)

On October 13, 2012, Plaintiff was seen by mental health staff and his prescription medications were adjusted.  (*Id.* at Exh. Q.)  Ten days later, on October 23, 2012, Plaintiff refused his medications.  (*Id.*)  The following day, on October 24, 2012, Plaintiff refused to eat due to an upset stomach, but did not present any other complaints.  (*Id.*)  It was noted on November 14, 2012, that Plaintiff often refused his evening medications.  (*Id.*)

### 4.    November 2012 Cell Flooding Event

On November 15, 2012, Plaintiff was again accused of damaging a sprinkler head in his cell.  According to a disciplinary report filed, Plaintiff created a hole in the ceiling by pulling on the sprinkler head, which "made the cell unusable."  (*Id.* at Exh. M.)  He also pulled the fire alarm.  (*Id.*)  Plaintiff pled not guilty to this charge.  (*Id.*)  As with the prior flooding-related charge, Plaintiff was accused of damaging government property, namely, his cell mattress and a typewriter.  (*Id.*)  For these charges, Plaintiff was found guilty by a hearing officer and sanctioned 15 days "lock" and 60 days of administrative segregation, and ordered to pay restitution in the amount of $1,314.97.  (*Id.* at Exh. N.)

Significantly, on the same day of this flooding-related charge, Plaintiff had a mental health appointment.  (*Id.* at Exh. Q.)  At this appointment, Plaintiff admitted that he broke the sprinkler head and flooded his cell; however, he complained of having been placed in a restraint chair by prison staff and indicated that he was angry at Custody and Administration.  (*Id.*)  Plaintiff, further, indicated that intentionally broke the sprinkler head "to get the Warden's attention" because he did not want to share his cell with his then roommate.  (*Id.*)  He expressed that his anger had "been

building up" and that he "needed to let it out." (*Id.*)  In the mental health professional's view, Plaintiff's "destructive behaviors have been well thought out, planned and intentionally carried out …." (*Id.*)

Also on that same date, Plaintiff refused his medications, was "counselled without success," and his pulse and skin was checked. (*Id.*)  According to the record, his "skin was warm, [and] his fingers and toes sensitive and mobile." (*Id.*)  He was "alert and oriented."  It is not clear from the record what time of day Plaintiff's condition, in this regard, was taken.

At 10:23 pm that day, Plaintiff was seen while in a "four points restraint" after he complained of shortness of breath. (*Id.*)  He was evaluated and found to be without injury, and he indicated to a nurse that the restraint belt had been loosened and that he "felt comfortable." (*Id.*)  During the night, Plaintiff was monitored by medical staff.  Specifically, at 3:25 am, the record notes that his "skin was intact, warm and dry," that there was no swelling and no other medical issues. (*Id.*)  At 6:58 am the next morning, Plaintiff accepted his medications and did not voice any complaints. (*Id.*)  Similarly, at 9:45 am, and at 1:15 pm, Plaintiff voiced no complaints, and his skin assessment was normal. (*Id.*)  At 5:47 pm, Plaintiff further indicated that he was "good and [would] be out from th[e] chair in four hours." (*Id.*)

At 7:40 pm, Plaintiff registered no complaints about the restraint chair, but noted that he was cold. (*Id.*)  The record indicates that Plaintiff did not complain again about coldness at his 10:00 pm checkup.

Plaintiff was also seen by mental health staff on November 16, 2012—the day after the second sprinkler incident—and indicated that he was still angry. (*Id.*)  Plaintiff was in a restraint chair at this time. (*Id.*)  The mental health staff member indicated a belief that Plaintiff was attempting to "set[ ] things" up for a lawsuit. (*Id.*)

The next day, November 17, 2012, Plaintiff continued to receive treatment. He was seen by staff and, again, did not complaint about the restraints. (*Id.*) He was released from the restraints by 6:40 am that morning. Sometime later that day, Plaintiff had another mental health appointment at which he discussed the second flooding-related charge. Plaintiff was trembling, and "stated that he had a lot on his mind." (*Id.*) He noted family issues, and that he was "fed up" with being housed with his roommate, and he expressed homicidal thoughts. (*Id.*) Based on the homicidal thoughts, Plaintiff was separated from others. (*Id.*)

That day, Plaintiff was placed in restraints a second time. (*See id.*) Plaintiff complained that the straps were too tights, but indicated to medical staff that he was fine once the straps were loosened. (*Id.*)

However, at 9:15 pm, Plaintiff was brought to medical provider to be seen for coldness. At that appointment, it was noted:

> **Chart Notes:**
> 9:15pm, [inmate] was brought to medical in shakles and handcuffs. [inmate's] body rigid, cold and freezing. All extremities appeared to be ice cold. [inmate] observed shaking and unable to speak. [inmate's] vital signs were unable to be recorded. [inmate] offered some warm water to drink and vs repeated  with T95.2, bp121/66, p74, pox 98%.  [inmate] stated that he was ready to give up causing any further problems with Sgt Kolonaski present. Msg was relayed to master control to Lt Fiovanti. Lt Fiovanti agreed to allow [inmate] to have a jumper suit, a blanket and s [sic] sheet but will be released from the restraint chair and placed in H2 in shakles until she receives the final word from the warden. This arrangement was agreed upon and [inmate] reportedly transferred to H2 and now currently calm and probably resting quietly. No further problems reported will cont to monitor.

(*Id.*)

Thereafter, on November 19, 2012, it was noted that Plaintiff had expressed further homicidal thoughts about his roommate. (*Id.*) Although concerned that Plaintiff was attempting

to manipulate the mental health staff, he was separated from others as a precaution. (*Id.*) Plaintiff indicated again that he had intentionally broken the sprinkler head and flooded his cell. (*Id.*) The notes indicate that the warden was notified of these incidents. (*Id.*) ("T[a]lked to the Warden as requested by the inmate and the warden's request for feedback.")

From November 20 through 22, 2012, Plaintiff was seen by medical staff several times. At each appointment, it was determined that Plaintiff was not in distress and that he could be returned to his cell. (*Id.*) On November 23, 2012, Plaintiff had another mental health appointment and, at that appointment, it was noted that he had been removed from segregated status by the warden, who believed that Plaintiff was engaged in manipulative behavior. (*Id.*) Plaintiff's demeanor was noted as "challenging and interrogatory," and that his thoughts were "logical and goal directed." (*Id.*) The notes state that Plaintiff was to be referred back to psychiatry and that he should not be seen for 10 days except for emergent matters. (*Id.*) Also contained in the record is a November 19, 2012 memorandum from one of the doctors, who had been treating Plaintiff, to the warden that documents Plaintiff's frustration with having to share his cell with a roommate, his homicidal thoughts, and the medical staff's counseling efforts. (*Id.* at Exh. S.)

Following this second flooding event, Plaintiff filed a series of grievances. Plaintiff filed a grievance addressed to Sergeant Moon on November 25, 2012, that asserted that he was denied the opportunity to appear at the hearing at which his disciplinary sanction was imposed. (Pl. Supp. Op., Exh. 2.) Plaintiff stated that, while he was in the restraint chair, he was told that he would be placed in the "courtline;" however, after he received his mental health treatment that day, he never called for the "courtline." (*Id.*). Plaintiff further complained that he did not receive a copy of the charges. (*Id.*). In response, Sergeant Moon noted on the form that the logbook would be changed to reflect that Plaintiff had not refused to appear at the hearing. (*Id.*).

Plaintiff filed a separate grievance that same day, which was addressed to the warden and asserted that Plaintiff had been placed in the restraint chair without proper clothing.  Specifically, he asserted that he was "wearing only underwear and a t-shirt and left in a cell under 30 [degree] temperature for over 50 hours, while being totally compliant and non[-]aggressive." (*Id.*)  Plaintiff stated that he was "taken out and given clothes [only] after nurse said [his] body temperature was dropping and that [he] could suffer from hypothermia." (*Id.*)  According to Plaintiff, it took 30 minutes of drinking hot tea to warm him.[6] (*Id.*)  Notably, Plaintiff had previously submitted a grievance on November 4, 2012, also addressed to the warden, which complained of extreme cold and asserted that he was being left in his cell with only a t-shirt and boxers to wear. (*Id.*)  Plaintiff claimed that he was being left without sufficient clothing for retaliatory reasons, although he does not specify what actions prison staff would have been retaliating against.  In response to this complaint, the staff response indicates that the window in Plaintiff's cell was caulked.

Also on November 25, 2012, Plaintiff addressed a grievance to the warden that stated his legal papers had been taken out of his cell in a "sealed Plastic garbage bag," after being "drenched in water," and then "held in hostage by Custody Staff …. " (Pl. Supp. Op., Exh. 2.)  Two days later, on November 27, 2012, Plaintiff filed another grievance, which he addressed to Phylss Oliver, a Lieutenant in Internal Affairs, and which also alleged that several officers and area sergeants destroyed legal papers that were housed in his cell. (*Id.*)  Plaintiff asserted, in the grievance, that the officers and sergeants did this out of retaliation for his prior grievance filings. (*Id.*)  On December 4, 2012, Sergeant Moon noted that Plaintiff admitted that all of his belongings, save 10 pictures, had been returned to him. (*Id.*)

---

[6]     The staff response to Plaintiff's grievance is too faint to be read by the Court.

Also on November 27, 2012, Plaintiff filed a third grievance, this time addressed to the warden, which alleged that his cell was being searched for contraband during every round in retaliation for his breaking the sprinkler head.  (*Id.*)  He contended that the officers were using the searches as an opportunity to "rifle" through his legal papers.  (*Id.*)

### 5.       January 2013 Disruptive Behavior Event

The following year, on January 7, 2013, Plaintiff was accused of disruptive behavior again. Specifically, a disciplinary report indicates that Plaintiff "threw a liquid substance out of his food" onto a sergeant's leg.  (*Id.* at Exh. O.)  Plaintiff was found guilty of this charge and sanctioned 20 days "lock" from January 7 through January 26, 2013.  (*Id.* at Exh. P.)

### 6.       Remaining Grievances

Plaintiff filed additional grievance throughout his time at MCCC.  These grievances included allegations that officers stole Plaintiff's reading glasses and threw away religious materials of his, and that the prison did not provide sugar for inmate coffee.  (*See generally* Pl. Supp. Op., Ex. 2.)[7]  In at least one grievance, Plaintiff asserted that his food was being tainted by a kitchen worker.  (*Id.*)  Additional grievances asserted that the plumbing was regularly backing up into Plaintiff's cell in October 2012.  (*See id.*)  He also complained of peeling paint in a grievance addressed to the warden in October 2012.

In early November 2012, Plaintiff complained in a grievance of being denied a new washcloth and towel for every shower, and Plaintiff asserted in several grievance forms dated in December 2012 that officers refused to provide him with hair clippers, and did not provide him with a laptop as quickly as he would have preferred.  (*Id.*)  Plaintiff requested video cameras to document officer rifling through his legal papers, also in December 2012.  (*Id.*)  Several of his

---

[7]       The Court notes that several of Plaintiff's grievance copies are too faint to be read.

grievances also involved medical concerns.  ((*See, e.g.*, *id.*) (seeking treatment for growth on back); *id.* (asserting that nurse gave incorrect pill and should be fired); *id.* (requesting psychiatrist); *id.* (failing to provide medication)).

### 7.    Defendant Certifications

Lastly, the Court notes that each defendant has filed a certification in which he or she professes a lack of wrongdoing.  For example, Defendant Estwan asserts in his certification that, contrary to the allegations in Plaintiff's Complaint, he never denied any request by Plaintiff to change cells, that he did not order Plaintiff to be placed back in a flooded cell, and that he did not destroy any of Plaintiff's legal paperwork.  (*See* Estwan Cert., ¶¶ 6-9.)  He also asserts that he was not aware of any of Plaintiff's grievance filings and, therefore, could not have acted with a retaliatory motive toward Plaintiff.  (*Id.* at ¶ 13.)  Similarly, Defendant Ellis, the warden, asserts that he "was not aware of any time when Plaintiff was kept in a cell with only a thin t-shirt and underwear," (*see* Ellis Cert., ¶ 13.), among other denials.  The Court will address the contents of these and other certifications in more detail, as they relate to Plaintiff's specific claims, in the following discussion section.

## II.      DISCUSSION

### A.      Legal Standards

#### 1.      Summary Judgment Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir. 1995). To do so, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor—that no reasonable jury could find for him, summary judgment is appropriate." *Alveras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007). "[P]ro se plaintiffs are not relieved of the obligation to set forth facts sufficient to survive summary judgment." *Jacobs v. Cumberland County Dept. of Corrections*, No. 09–0133, 2010 U.S. Dist. LEXIS 130007, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010).

### 2.      Section 1983 Standard

"Section 1983 provides a cause of action against every person who, under color of state law, subjects, or causes to be subjected, another person to a deprivation of a federally protected right." *Barkes v. First Corr. Med.*, 766 F.3d 307, 316 (3d Cir. 2014) (quoting 42 U.S.C. § 1983) (internal quotation marks omitted).

### B.      Denial of Medical Care Claim

Plaintiff asserts a denial of medical care claim against Defendant Frascella, a corrections officer at MCCC, and Defendant Estwan, a sergeant at the facility. Regarding Frascella, Plaintiff asserted that he ignored Plaintiff and refused to get him medical attention on November 22, 2012

when Plaintiff informed Frascella that he could not breathe, and that he passed out as a result. According to Plaintiff's Complaint, Frascella told him, "why don't you write one of your grievances."  Compl., ¶ 42.  With respect to Defendant Estwan, Plaintiff asserted in his complaint that Estwan denied him medical attention when Plaintiff informed him that he was having "severe chest pains, and difficulties breathing well."  Compl., ¶ 28.

As this Court previously explained in its Opinion dated September 18, 2013, "[f]or the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate '(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious.'"  *Pierce v. Pitkins*, No. 12-4083, 2013 WL 1397800, at *2 (3d Cir. Apr. 8, 2013) (per curiam). at *2 (citing *Rouse v. Plaintier*, 182 F.3d 192, 197 (3d Cir. 1999)).  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v.* Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

The problem here for Plaintiff is that he has not presented any evidence demonstrating that either Frascella or Estwan was deliberately indifferent to his medical needs.  He has alleged in his complaint that Frascella and Estwan ignored his request for treatment; however, as explained above, "pleadings are insufficient to repel summary judgment." *Schoch*, 912 F.2d at 657, and *pro se* plaintiffs—like all other plaintiffs—must meet their evidentiary burden.  Although Plaintiff points to his stack of grievances in his supplemental opposition, proof that he filed a particular (indeed, many) grievances does not establish that either defendant ignored his request for medical treatment and refused to obtain medical care on his behalf.  In this regard, both defendants deny

18

this in their certifications and attest that they did not refuse to seek treatment for Plaintiff.  (*See* Frascella Cert., ¶ 5; Estwan Cert. ¶ 11.)

Plaintiff's institutional records are also unhelpful to Plaintiff.  His records show that he was attended to by medical staff on November 22, 2012, and that his condition was unremarkable. More specifically, the record reveals that Nurse Matt Polyak received a call from Sergeant Estwan in response to Plaintiff's request to have his blood pressure taken.  (*See* Defs.' Br., Exh. Q.) However, Plaintiff refused to elaborate to the attending officer the nature of his medical complaint; accordingly, he was notified by that officer that, when he was ready to communicate the basis for his medical complaint, the medical staff would be ready to address his needs.  (*Id.*)  At 9 p.m. that day, the record further reveals that Plaintiff was seen by the medical department after complaining of chest pains and claiming that he passed out.  (*Id.*)  He again asked that his vital signals be checked, and denied any shortness of breath, chest pains or palpitations.  (*Id.*)  His vital signs were insignificant and he was instructed to return to his cell.  (*Id.*)

Viewing this evidence in the light most favorable to Plaintiff, it is consistent with his allegation that he "passed out."  Nevertheless, it does not speak to whether Frascella or Estwan refused to send him for treatment *for a serious medical need* prior to him passing out and, therefore, does not aid him in establishing deliberate indifference.  Indeed, the record establishing Estwan's call on Plaintiff's behalf affirmatively demonstrates that he took some action that day on Plaintiff's behalf to communicate to the medical department Plaintiff's request.  And, Plaintiff has not pointed to any evidence substantiating that the told Estwan or Frascella that he could not breathe.

It is well established that a party may obtain summary judgment by demonstrating that the party with the burden of proof failed to produce evidence demonstrating the existence of a genuine issue of material fact.  *See, e.g., Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of*

*Educ.*, 587 F.3d 176, 196-97 (3d Cir. 2009) ("Once the [defendant] met its initial burden, it was incumbent on the [plaintiffs] to show the existence of a genuine issue of material fact. They plainly failed to do so . . . the record does not reflect that the [plaintiffs] presented any competent evidence in support of their claim, as they were required to do."); *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) (affirming grant of summary judgment where plaintiff "failed to show a genuine issue of material fact on the issue of [the defendant's] 'deliberate indifference.'"). This rule applies with equal force here. Therefore, summary judgment is granted on Plaintiff's medical care claims against Estwan and Frascella.

**C.     Cruel and Unusual Punishment Claims**

Plaintiff brings cruel and unusual punishment claims against the MCCC warden, Defendant Ellis, and against Defendant Estwan, a sergeant at the facility. In his complaint, Plaintiff alleged that Ellis ordered that Plaintiff be kept underdressed in a frigid cell with no blankets, sheets, socks, or towels. He further alleged that he was kept in a cell that had no running water, and that was covered in oil and filthy water. Regarding Estwan, Plaintiff similarly alleged in his complaint that Estwan ordered that he placed naked in a cell that was below thirty degrees, also without sheets and blankets, and that Estwan placed him a cell covered in oil.

As the Court noted in its September 8, 2013 decision, Plaintiff's cruel and unusual punishment claims must be analyzed under fourteenth amendment due process standards—as opposed to eighth amendment standards—because he was a pretrial detainee at the time of the alleged constitutional violations. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 n. 4 (3d Cir. 2014) (noting that plaintiff's claims that arise when he is a pretrial detainee are prosecuted under the Due Process Clause).

To prevail on a due process-based conditions of confinement claim, an inmate must show that the "conditions amount to punishment of the detainee;" "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In making this determination, courts ask two questions: (1) whether the conditions serve any legitimate purpose; and (2) whether the conditions are rationally related to that purpose. *Id.* (quoting *Union County Jail Inmates v. Di Buono*, 713 F.2d 984, 992 (3d Cir. 1983)). A condition is legitimate if it is reasonably related to the governmental considerations of "maintaining security and order and operating the institution in a manageable fashion." *Id.* (quoting *Bell*, 441 U.S. at 538-39). The Supreme Court has cautioned lower courts that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.*

Defendants Ellis and Estwan argue in support of their motion for summary judgment that Plaintiff has failed to produce any record evidence to substantiate his allegations against them. As noted above, Plaintiff has not presented to the Court any deposition testimony, affidavits, or certifications, made under penalty of perjury, in support of his claims. In addition, Ellis, in his certification, denies ever ordering that Plaintiff be placed in a cell "without blanket, sheets, socks, towels, jumper or other articles" or "with only a thin t-shirt and underwear." (Ellis Cert., ¶¶ 12-13.) He further denies ever being aware of Plaintiff being housed in a cell "where temperatures were at or below thirty (30) degrees." (*Id.* at ¶ 12.) And, according to Ellis' certification, he "was not aware of any time when Plaintiff was kept in a cell without running water and/or with oil and filthy water covering everything in the cell including any mat(s)." (*Id.* at ¶ 13.) Similarly, Estwan

states in his certification: "[a]t no time did I order Plaintiff to be stripped naked and placed back in a cell that was covered in water and oil without sheets, blankets, running water, toothbrush, toothpaste, soap, or toilet paper." (Estwan Cert., ¶ 7.)

In his opposition papers, Plaintiff points to the medical note in his institutional record that documents his November 17, 2012 visit to the infirmary. This visit followed the second cell flooding incident and Plaintiff's placement in the restraint chair. The medical chart notes indicate that he was brought to the infirmary cold and shaking:

> **Chart Notes:**
> 9:15pm, [inmate] was brought to medical in shakles and handcuffs. [inmate's] body rigid, cold and freezing. All extremities appeared to be ice cold. [inmate] observed shaking and unable to speak. [inmate's] vital signs were unable to be recorded. [inmate] offered some warm water to drink and vs repeated with T95.2, bp121/66, p74, pox 98%. [inmate] stated that he was ready to give up causing any further problems with Sgt Kolonaski present.

(Defs.' Br., Exh. Q.) The notes further indicate that a lieutenant allowed the medical personnel to give Plaintiff a jumper suit, a blanket, and a sheet. Notably, the lieutenant also ordered that Plaintiff "be released from the restraint chair and placed . . . in shakles until [the lieutenant] receive[d] the final word from the warden." (*Id.*)

Plaintiff argues that this medical chart entry demonstrates that, contrary to his statements in his certification, Ellis was aware that the "health and safety of Plaintiff was disregarded" and that Ellis was aware that Plaintiff "was housed in frigid temperatures with only a t-shirt and underwear." Pl. Opp. at 2. Even viewing this evidence in the light most favorable to Plaintiff, this evidence, at best, could be interpreted by a jury to indicate that Ellis knew about Plaintiff's placement in the frigid cell with insufficient clothing *after* the incident occurred. Nothing in the chart notes indicate that Ellis made the decision to place him in that cell, or that he knew that his subordinates were placing him in that cell. This distinction is critical because a supervisor may

not be held liable for the actions of his subordinates under a theory of *respondeat superior*; he may be held liable only for his own unconstitutional acts, for directing his subordinates to commit such acts, or for having knowledge of subordinates acts and acquiescing in them.   *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010); *accord Roberts v. Aviles*, Civil Action No. 10–5916 (FSH),  2012 WL 603790, at *3, n.11 (D.N.J. Feb. 16, 2012).

To be clear, the Third Circuit's recent decision in *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307 (3d Cir. 2014), suggests that a supervisor may be held liable in a section 1983 action even where there supervisor does not "have personal knowledge of an individual inmate" but "there is evidence of serious inadequacies in the [prison's system], and there is evidence that [the supervisor was] aware of the problem and yet indifferent to the risk that an inmate would suffer a constitutional injury …." *Id.* at 323-25.   Even applying *Barkes*, the medical chart notes are unhelpful to Plaintiff because they could not be read by a factfinder to demonstrate that Ellis knew of a general risk in the prison that inmates would be exposed to freezing temperatures in their cells, and that they would be underdressed in those cells.

In this connection, Ellis states in a supplemental certification that he was not aware of any generalized, freezing-temperature based risk:

> never knew of and/or disregarded an excessive risk to *any* inmate's health or safety — including Plaintiff.   Specifically, prior to the incident noted in Plaintiff's opposition papers, I was not aware that the temperature in Plaintiff's cell was cool/cold enough to create an excessive risk to Plaintiff's health or safety.

(Ellis Supp. Cert., ¶ 5.)  And Plaintiff does not point to record evidence disputing this contention, thus, this supplemental certification language does not, alone, create a genuine issue of material fact.

Additional evidence in the record, however, gives the Court pause.  Ellis acknowledges in his supplemental certification that MCCC has an outdated HVAC system and that "[i]ncreasing the temperature in one area of MCCC frequently — and inadvertently —  results in temperature decrease in another area of MCCC."  (*See* Ellis Supp. Cert., ¶¶ 1-2.)  Viewing this statement in the light most favorable to Plaintiff, it could be interpreted by a jury to mean that Ellis was aware of a temperature control problem in the facility; however, it could not be inferred from this statement alone that Ellis was aware of a risk that the cells could decrease to freezing temperatures.

Furthermore, Plaintiff argues in his opposition papers that the grievances he submitted also demonstrate that Defendants had knowledge of the risk of harm posed by the temperature control problem.  Plaintiff has not pointed to any specific grievance in his opposition papers and, as recounted above, Plaintiff filed numerous grievances during his time at MCCC.  The Court's review of the grievances revealed one grievance that Plaintiff submitted prior to November 17, 2012, that complains of being exposed to cold temperatures.  This grievance was submitted on November 4, 2012, was addressed to the warden, and complained of extreme cold due to a leaking window.  Plaintiff asserted in the grievance that he was left in his cell with only a t-shirt and boxers to wear, and that this was done to him for unspecified retaliatory reasons.  The staff response on the grievance indicates that the window in Plaintiff's cell was caulked.

Plaintiff's statement, in the November 4, 2012 grievance, that he was dressed only in a t-shirt and boxers is noteworthy, particular when viewed in connection with other record evidence.  At Plaintiff's mental health appointment on September 1, 2012, the medical notes for that appointment indicate that Plaintiff was "dressed in a[n] oversized tee shirt and a pair of boxers."  (*Id.*)  And, as noted above, Ellis acknowledges in his supplemental certification that MCCC's HVAC system may inadvertently reduce the temperature in the facility.  While this evidence does

24

not conclusively establish that Ellis was aware that there was a risk that a detainee could be exposed to *freezing* temperatures, that there is a documented history of Plaintiff being placed in his cell with little clothing while there is a known temperature control problem at the facility is nonetheless a cause of concern for the Court.

In his supplemental opposition papers, Plaintiff argues that there is additional evidence that will prove that Ellis was aware of the risk of detainees being placed, underdressed, in freezing cells. He contends that, while he was placed in the restraint chair, his actions were documented by the attending officer in 15-minute increments "in a black & white composition notebook." Pl. Supp. Op. at 2. Plaintiff, further, contends that all of the officers in his cell on November 17, 2012, were wearing coats, as well as an officer outside of his cell. Therefore, even though the evidence in the instant record does not create a genuine issue of material fact as to whether Ellis knew of a freezing temperature risk to detainees, it is possible that the evidence Plaintiff contends he can produce, when viewed in conjunction with the aforementioned evidence, may be sufficient to create a genuine issue of material fact on this issue.

When a party facing summary judgment fails to properly support an assertion of fact, Federal Rule of Civil Procedure 56 authorizes courts to deny summary judgment and give that party an opportunity to supplement the summary judgment record. More specifically, Rule 56(e)(1) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact[.]" In addition, the 2010 Advisory Committee Notes regarding this rule explain:

> summary judgment cannot be granted by default even if there is a
> complete failure to respond to the motion, much less when an
> attempted response fails to comply with Rule 56(c) requirements.
> Nor should it be denied by default even if the movant completely

> fails to reply to a nonmovant's response. Before deciding on other possible action, subdivision (e)(1) recognizes that a court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step.

Federal Civil Judicial Procedure & Rules 258 (Thomson Reuters, 2013 Revised Ed.).  The Court views this as an appropriate instance for application of this subsection of the rule.  Therefore, the Court will deny without prejudice Defendants' motion with respect to this aspect of Plaintiff's conditions of confinement claim against Defendant Ellis.

Turning now to the lack of running water and filthy water/oil allegations, Plaintiff has not pointed to any evidence in the record, nor suggested that he can produce any evidence, to substantiate these allegations on summary judgment.  The Court's review of the record reveals that Plaintiff mentioned to medical staff that he was in a "dry" cell, and that Plaintiff filed grievances about this issue.  Even viewing this evidence in the light most favorable to Plaintiff, this evidence does not show that Ellis or Estwan directed that he be placed in such conditions, that they directed subordinates to commit such acts, or that they had knowledge of these acts and acquiesced in them. *See Hartmann v. Carroll*, 929 F. Supp. 2d 321, 327 (D. Del. 2013) *aff'd*, 582 F. App'x 111 (3d Cir. 2014) ("[T]he filing of a grievance is not sufficient to show the actual knowledge necessary for personal involvement.") (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988)).  Nor do the medical records or grievances demonstrate that either defendant had knowledge of a generalized risk that a detainee would be placed in such conditions.  Accordingly, summary judgment is granted on this aspect of Plaintiff's claim.

In sum, the Court will direct that discovery be reopened solely on the issue of whether Defendant Ellis knew of a particularized or generalized risk that detainees could be held in a cell with freezing temperatures while underdressed.  Discovery shall be reopened for a period of forty-

five (45) days.  Once discovery is closed, Plaintiff will have thirty (30) additional days to serve on Defendants, and to submit to the Court his own certification *made under penalty of perjury* regarding the events that took place on November 17, 2012, that he described in his supplemental opposition, along with any other relevant materials obtained through discovery, such as copies of the black & white composition book entries.

Once Plaintiff files the discovery materials listed above, or if Plaintiff fails to file such materials within the allotted time frame, Defendants may file another motion for summary judgment at that time, if they so choose.

**D.      Excessive Force Claims**

Plaintiff brings an excessive force claim against Defendant Walker, a sergeant at MCCC. In his complaint, Plaintiff alleges that, on or about November 15, 2012, Walker purposefully placed restraints on him "too tightly" after a nurse informed Walker that the restraints were too tight and directed him to loosen them.  Compl., ¶ 37.  According to the complaint, Walker "retighten[ed] [the] restraints after [the] nurse left."  (*Id.*)

The "Eighth Amendment cruel and unusual punishments standards found in *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) and *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), apply to a pretrial detainee's excessive force claim …." *Bistrian v. Levi*, 696 F.3d 352, 374 (3d Cir. 2012).  Under this jurisprudence, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. 1, 7 (1992).  *See also Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013).  To determine whether the force was applied appropriately, courts consider: "(1) the need for force, (2) the relationship between the need and the amount of force used, (3) the extent of injury, (4) the extent of the threat to safety as reasonably perceived by

officials, and (5) any efforts made to temper the severity of a forceful response." *Everett*, 547 F. App'x at 121 (quoting *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)) (internal quotation marks omitted).

Plaintiff has not pointed any record evidence to substantiate his allegations, and Walker disavows any use of excessive force. In his certification, Walker avers that "[a]t no time did [he] purposely put the restraints of a restraint chair on Plaintiff too tightly." (Walker Cert., ¶ 4.) Walker further states that he did not "retighten the restraints of a restraint chair after they had been loosened during, or as a result of, an examination by medical staff." (*Id.* at ¶ 5.) Plaintiff's institutional record indicates that he was seen by a nurse at 10:23 pm on November 15, 2012, while he was in a restraint chair. The medical notes indicate that he was found to be without injury, and that he indicated to the nurse that he "felt comfortable" since the restraint belt had been loosened. Later, at 3:25 am that night, the record notes that his "skin was intact, warm and dry," that there was no swelling and no other medical issues. And, throughout the following morning, the record indicates that Plaintiff did not complain about the restraints being retightened, and that his skin assessment was normal.

This evidence, viewed in the light most favorable to Plaintiff, does not support his contention that Walker retightened the restraint chair straps after the nurse left. To the contrary, this evidence appears to contradict his contention. Moreover, Plaintiff has not suggested that there exists evidence outside the record that could substantiate his claim. Therefore, summary judgment is appropriate on this claim as Plaintiff cannot demonstrate that Walker applied force maliciously and sadistically to him to cause him harm.

**E.      Retaliation Claims**

Finally, Plaintiff brings first amendment retaliation claims against Defendants Ellis, Rogers, Creighton, Miszak, and Frascella. To prevail on his retaliation claim, Plaintiff would have to show that he engaged in constitutionally protected conduct in the form of filing grievances, suffered an adverse action, and that the adverse action was done in retaliation for Plaintiff having engaged in the protected conduct. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011) (citing *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002)). "Even if the plaintiff proves these elements, 'the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Petko v. Radle*, --- F. App'x. --- , 2014 WL 6779960, at *1 (quoting *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001)). The Court separately addresses the retaliation allegations against each defendant.

### 1. Ellis

Plaintiff alleged in his complaint that Ellis, as warden of MCCC, ordered that Plaintiff be kept underdressed in a cell under thirty degrees with no blankets, sheets, socks, or towels; that he ordered Plaintiff to be placed in a cell without running water that was covered in filthy water; that he ordered Plaintiff to be placed in ankle shackles and forced him to sleep in those shackles; and that he ordered Plaintiff's legal papers to be taken from him and not returned. (Compl., ¶¶ 2-9.)

While, as discussed *supra*, additional discovery may create a genuine issue of material fact as to whether Ellis knew of a generalized risk that underdressed detainees could be forced to withstand freezing temperatures, there is no record evidence that substantiates Plaintiff's contention that Ellis acted with a retaliatory motive. Ellis, in his certification, denies contemporaneous knowledge of Plaintiff's grievances and avers that he did not retaliate against Plaintiff:

> At the time of the allegations made against me, I was not aware of any grievance(s) filed by Plaintiff against me or any other MCCC staff. *The only substantial or motivating factor in any decision to take adverse action against Plaintiff was based solely on Plaintiff's [inappropriate] behavior ….*

(Ellis Cert., ¶ 20) (emphasis added). *See also* Ellis Supp. Cert., ¶ 8. ("As previously certified, the only substantial or motivating factor in any decision to take adverse action against Plaintiff was based solely on Plaintiff's behavior and the disciplinary infractions [imposed].))   Plaintiff's repeated disciplinary violations, including his admission that he damaged prison property in order to garner the warden's attention, are chronicled in detailed *infra*.  And, there is no evidence in the record that contradicts Ellis' averment that his actions (to the extent there were any) in regards to Plaintiff were based on this legitimate penological interest of maintaining order and safety in the prison.

In his opposition papers, Plaintiff points to his numerous grievances as proof that the warden was aware that he had been exercising his constitutional right to complain against alleged mistreatments.  Even assuming that the warden was aware each grievance Plaintiff filed (which may not be the case since, even though some grievances were addressed to Ellis, he did not sign or acknowledge them), Plaintiff's retaliation claim against him fails because he has not created a genuine issue of material fact as to whether Ellis acted with a retaliatory motive.  Accordingly, summary judgment is granted on Plaintiff's retaliation claim against Ellis.

### 2. Rogers

Plaintiff alleges, in his complaint, that Defendant Rogers retaliated against his filing of grievances against her by interfering with his access to the courts.  According to the complaint, Rogers is the Program Services Coordinator at MCCC.  (Compl., ¶ 4c.)  Plaintiff defines Rogers' retaliatory acts as denying him access to a typewriter, censoring his legal research, refusing to

allow him to obtain copies of legal documents, and interfering with his document preparation.  (*Id.* at ¶¶ 12-13.)  Plaintiff has not pointed to any evidence in the record to support his retaliation claim against Rogers.  Defendants point to a certification by Rogers in their moving papers, in which she denies engaging in the conduct alleged by Plaintiff; however, no such certification was actually filed with the Court.  Nonetheless, even without a certification from Rogers, summary judgment is appropriate because Plaintiff may not rest on his pleadings at the summary judgment stage and because the Court's review of the record does not reveal any evidence that would suggest that Rogers acted with a retaliatory motive, even assuming that she was aware of Plaintiff's grievances.  Accordingly, summary judgment is granted on Plaintiff's retaliation claim against Rogers.

### 3.     Creighton

Regarding Defendant Creighton, a sergeant at MCCC, Plaintiff alleged in his complaint that Creighton retaliated against him for filing two specific grievances in the fall of 2012.  Specifically, Plaintiff asserts that Creighton "harassed, intimidated, and threatened [him] with physical violence and death" after he filed a grievance against Officer Snyder on August 30, 2012.  (Compl., ¶ 31.)   Further, Plaintiff asserts that Creighton "entered [his] cell [and] purposely destroyed [his] legal research, prescription eye glasses, urinated on [his] bed, and threatened [him] with physical violence if he filed another grievance …."  (*Id.* at ¶ 32.)  As with his other claims, Plaintiff has not pointed to any record evidence to substantiate these allegations at the summary judgment stage.  Creighton, in a certification, denies these allegations wholesale.  (Creighton Cert., ¶ 8.)   And, this Court's review of the record has not revealed any evidence contradicting Creighton's contention; accordingly, summary judgment is granted on this claim in light of the lack of a genuine issue of material fact as to whether Plaintiff suffered an adverse action attributable to Creighton.

### 4.     Miszak

With regard to Defendant Miszak, Plaintiff alleged in his complaint that this sergeant struck him in the chest while he was placed in the restraint chair, on or about November 16, 2012. (Compl.., ¶ 34.)  Plaintiff asserts that this action was done in retaliation for his having previously filed grievances against Miszek and other officers.  Similar to several of Plaintiff's other retaliation claims, this claim fails because Plaintiff has not pointed to any record evidence to substantiate his allegations, Miszak certifies that he did strike or threaten Plaintiff, and this Court's review of the record does not reveal any evidence from which a reasonable factfinder could conclude that Miszak perpetrated an adverse action against Plaintiff with a retaliatory motive.  Summary judgment is, therefore, appropriate on this claim.

### 5.     Frascella

Regarding Frascella, as discussed *supra*, Plaintiff asserted in his complaint that Frascella refused to get Plaintiff medical attention on November 22, 2012.  According to Plaintiff's Complaint, in refusing to seek medical care for him, Frascella said, "why don't you write one of your grievances."  (Compl., ¶ 42.)  Plaintiff further alleged in his complaint that Frascella reacted in this way out of retaliation for Plaintiff having filed a grievance against him on October 21, 2012, which grievance asserted that Frascella failed to give Plaintiff his medication.  Plaintiff has not pointed to record evidence that substantiates these allegations.

In support of the motion for summary judgment, Frascella denies these allegations, stating that he did not refuse to seek medical care for Plaintiff and that he was not aware of the grievances filed by Plaintiff.  (*See* Frascella Cert., ¶¶ 5-6.)  Frascella does not address, in his certification, whether he said to Plaintiff "why don't you write one of your grievances."

Summary judgment is appropriate on this claim for several reasons.  First, as discussed *infra* in connection with Plaintiff's denial of medical care claim against Frascella, there is no record evidence from which a reasonable factfinder could conclude that Frascella engaged in the adverse action—refusing to seek medical care for Plaintiff.  So, even assuming that Frascella stated to Plaintiff "why don't you write one of your grievances," without evidence of an adverse action, Plaintiff's retaliation claim against Frascella fails.  Second, as with several of Plaintiff's retaliation claims, Plaintiff has not pointed to, and this Court's review of the record did not reveal, any evidence creating a genuine issue of material fact as to whether Frascella acted with retaliatory intent.  Therefore, summary judgment is appropriate on Plaintiff's retaliation claim.

## III.    CONCLUSION

For the foregoing reasons, summary judgment is granted in part and denied in part. Summary judgment is granted on the bulk of Plaintiff's claims against Defendant Charles Ellis, and all claims against Defendants Linda Rogers, Christopher Estwan, Sergeant Creighton, Sergeant Miszak, Sergeant Walker, and Christopher Frascella.  Summary judgment is denied, without prejudice, only as to the due process-based, cruel and unusual punishment claim against Defendant Ellis to the extent that claim rests on the freezing temperature allegations.


Dated: April 14, 2015


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.